# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

SHANNON KOTARY,

                     Plaintiff,

       v.                                         6:16-CV-90
                                                  (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                     Defendant.

---

HOWARD D. OLINSKY, ESQ., for Plaintiff
DAVID L. BROWN, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, by the Honorable Thomas J. McAvoy, Senior United States District Judge, by Order dated September 8, 2016 (Dkt. No. 13), in accordance with the provisions of 28 U.S.C. § 636 (c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties.

## I.    PROCEDURAL HISTORY

Plaintiff Shannon Kotary protectively filed[1] an application for Supplemental Security Income ("SSI") benefits on March 1, 2012, claiming disability beginning on January 22, 2012 due to severe ulcerative colitis (colon removed) and depression. (Administrative Transcript ("T.") at 59, 130-40, 151, 155). Plaintiff's application was initially denied on July 16, 2013 (T. 13), and she made a timely request for a hearing

---

[1]When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. § 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

before an Administrative Law Judge ("ALJ"). (T. 85-87). On June 10, 2014, plaintiff appeared for the hearing, held by video conference before ALJ Joseph L. Brinkely. (T. 28-57). On August 19, 2014, the ALJ found that plaintiff was not disabled. (T. 13-23). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on November 23, 2015. (T. 1-4).

## II. **GENERALLY APPLICABLE LAW**

### A. **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work

2

activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision.  *Id*.  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record.  *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony).  However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

Plaintiff was born in 1969, and she was 45 years old at the time of the ALJ hearing. (T. 13, 21, 23, 151).  She completed the twelfth grade, and has past work as a general accounting clerk and a loan officer. (T. 21, 33, 156).  Plaintiff has a history of inflammatory bowel disease ("IBD"), ulcerative colitis, and Crohn's Disease, diagnosed in 2007. (T. 220) (Discharge Summary).  On February 15, 2012, plaintiff was admitted to Albany Medical Center ("AMC"), and on February 26, 2012, she underwent a laparoscopic removal of her colon with end-ileostomy[2] due to her IBD and a GI bleed.[3]

---

[2] An ileostomy is an opening in the abdominal wall, made during surgery, constructed by bringing the end or loop of the small intestine out onto the surface of the skin. https://medlineplus.gov

(T. 220-21). The attending physician was Dr. Jonathan J. Canete, M.D. (*Id.*) Plaintiff was discharged from AMC on March 1, 2012. (*Id.*) Upon discharge, her colostomy was functional with good output, and she tolerated diet very well. (T. 221).

On August 21, 2012, Dr. Canete stated that the plaintiff was "doing well," and was examined in order to discuss the timetable for the reversal of her loop ileostomy.[4] (T. 311-12). On September 12, 2012, plaintiff was again admitted to AMC for a resection and closure of the loop iliostomy, performed by Dr. Canete. (T. 310) (Discharge Summary). The ostomy healed, and plaintiff was stooling through her rectum. (T. 332).

Plaintiff then developed a hernia at the ostomy site and underwent surgery for that on June 10, 2013. (T. 332, 387). A laparoscopic mesh repair was successful. (T. 387). However, in September of 2013, plaintiff began to experience pain on both sides of her abdomen, and it was determined that the mesh was adhering to her intestine. (T. 388). Dr. Canete examined plaintiff on March 11, 2014 and stated that she was doing well after her bowel reconstruction, and her "functional result after J-pouch

---

/ency/article/007378.htm. It is used to move waste out of the body when the colon or rectum is not working properly. *Id.*

[3] On February 8, 2012, plaintiff went to another hospital with complaints of fever, abdominal pain, and diarrhea. (T. 220). At first, it was suspected that the plaintiff was having a flare-up of her IBD and was placed on intravenous steroids. Infectious C. Diff. Colitis (Clostridium difficile) was also suspected. (*Id.*) C. Diff. is a bacterium that can release toxins that attack the lining of the intestines. http://www.webmd.com/digestive-disorders/clostridium-difficile-colitis#1. Plaintiff was placed on medication for this infection. However, plaintiff developed blood clots. She was placed on anticoagulation, but then developed the GI bleed, which caused her transfer to AMC "for [a] higher level of care."

[4] Dr. Canete noted that plaintiff had some surgery in June of 2012 (T. 318-19) and was readmitted in July for a suggestion of pelvic sepsis, but no organized collection was found, she was managed conservatively, and was eventually discharged. (T. 311, 314-15).

reconstruction is stable and typical at this point." (*Id.*)  Dr. Canete did not recommend "dissection to free the adhesions" because it could result in injury to the bowel and it could contaminate the mesh, potentially requiring plaintiff to lose the "ilial J-pouch."[5]

Dr. Canete also noted that plaintiff's husband reported that the plaintiff had gained weight since her prior examination. (T. 388).  Dr. Canete "agreed with her husband that the increase in her abdominal girth may have increased the tension exerted on the implanted mesh, resulting in additional discomfort at the site of mesh location." (*Id.*)  Dr. Canete agreed that a program of weight loss was in plaintiff's best interests "for her overall health as well as her current symptoms." (*Id.*)  He recommended that plaintiff follow-up with her primary care provider "regarding the appropriate strategy to achieve this goal." (*Id.*)  Plaintiff was told to follow-up with Dr. Canete in one year for "surveillance of the pouch." (T. 389).

On March 25, 2014, plaintiff was examined by her treating Nurse Practitioner ("NP") Susan M. Grove, who managed plaintiff's mental as well as physical problems. NP Grove stated that plaintiff was taking Effexor[6] for her depression.  NP Grove's March 25, 2014 note discussed the last appointment that plaintiff had with Dr. Canete and the options that he discussed with the plaintiff, including the dangers of attempting surgery to fix the adhesions. (T. 408).  Plaintiff did not wish to take the chance of

---

[5] A J-pouch is a surgically constructed reservoir for bowel contents to exit the body.  This allows an individual to eliminate normally after removal of the rectum. http://www.mayoclinic. org/tests-procedures/ileoanal-anastomosis-surgery/basics/definition/prc-20013306.  A loss of the J-pouch would result in plaintiff requiring the use of a colostomy bag.

[6] Effexor (venlafaxine) is an antidepressant in a group of drugs known as selective serotonin and norepinephrine reuptake inhibitors ("SSNRIs"). https://www.drugs.com/effexor.html.  The drug is also used to treat anxiety and panic disorder. (*Id.*)

needing "a bag" for the rest of her life. (*Id.*)

During the conversation with NP Grove, plaintiff stated that she was "quite proud of herself" because she had been going to the gym three days per week for the last two weeks, in addition to using the "gazelle" at home. She had increased her walking time from 25 to 45 minutes, and her speed had gone from "2.4 to 3.2." (*Id.*) Plaintiff stated that she was "feeling great," but was frustrated that she had not lost any weight, but "all in all she is doing well." (*Id.*) Plaintiff also told NP Grove that "[i]n [plaintiff's] conversations with Dr. Canete, he has indicated to her that she can not lift over 50 pounds and should watch the reaching, pulling and pushing." (*Id.*)

Her physical examination was normal. (T. 408-409). Her mood and affect were "appropriate." (T. 409). NP Grove suggested that plaintiff continue the Effexor and should contact her insurance company about the cost of a therapist. NP Grove stated that "she would benefit from psychotherapy just a little support for her." (*Id.*) NP Grove's report also stated that plaintiff was "working" as a "foster parent."[7]

The record contains several other reports by NP Grove in addition to reports by NP Patricia Marello, and consultative examinations by Dr. Cheryl Loomis, Ph.D. (T. 338-41 - 5/20/13 - Psychological) and Dr. Tanya Perkins-Mwantuali, M.D. (T. 332-36 - 5/17/13). The plaintiff's brief discusses additional medical records and hearing evidence. Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

---

[7] Plaintiff has four children of her own.

## IV.   **THE ALJ'S DECISION**

The ALJ found that plaintiff had not engaged in substantial gainful activity since plaintiff's March 1, 2013 SSI application date. (T. 15). At step two of the disability analysis, the ALJ found that plaintiff has the following severe impairments: anemia; IBS; ulcerative colitis; status-post inguinal hernia repair; Crohn's disease; status-post blood clots; status-post ileostomy placement; and depression with anxiety. (T. 15).

At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a Listed Impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id.*) In making this determination, the ALJ considered Listings 5.00 (Digestive System); 7.00 (Hematological Disorders); 12.04 (Affective Disorders); and 12.06 (Anxiety-Related Disorders), noting that plaintiff did not claim to meet any of the Listed Impairments. (*Id.*)

At step four of the analysis, the ALJ found that plaintiff has the RFC to perform light work, except that plaintiff is limited to sitting, standing, and walking - each - independently for one hour at a time before having to transition to one of the two remaining alternate postural positions for fifteen minutes before returning to the previous position. (T. 17). Plaintiff is limited to sitting six hours of an eight-hour work day with interruptions and regularly scheduled breaks, and she is limited to standing and walking for a combined total of six hours in an eight-hour workday with interruptions and regularly scheduled breaks. (*Id.*)

Plaintiff may occasionally climb ramps or stairs, balance, kneel, and stoop, but may never crawl, crouch, or climb ladders, ropes or scaffolds. She must avoid

concentrated exposure to wetness and workplace hazards, including unprotected heights and dangerous machinery. (*Id.*) Plaintiff would also need "unimpeded access" to a restroom during regularly scheduled breaks. Finally, plaintiff is limited to simple, routine, repetitive tasks. She can understand, remember, and follow simple routine work instructions, and is limited to jobs which do not require high volume production quotas and/or fast-paced assembly lines. (*Id. See* T. 17-21). In making this determination, the ALJ also considered plaintiff's symptoms and the extent to which those symptoms would cause specific limitations. (T. 17).

The ALJ found that plaintiff could not perform her prior work. (T. 21). Due to the additional limitations that would be imposed on plaintiff, the ALJ considered the testimony of a Vocational Expert ("VE") who testified at the hearing. In response to hypothetical questions which included plaintiff's above-cited limitations, the VE testified that there were three jobs which existed in significant numbers in the national economy that plaintiff could perform – a document preparer; a stuffer; and a cutter-paster. (T. 22).

The ALJ noted that, during the hearing, plaintiff's counsel asked the VE whether an employer would accept a person having three additional bathroom breaks "for ten minutes each," to which the VE responded that there would be no jobs available. (T. 22-23). However, the ALJ stated that the plaintiff was "able to sit for almost an entire hour before she left to use the restroom," and that it did not appear that "any physician or clinician gave such severe limitations throughout the longitudinal record." (T. 23). Based on these statements, and a discussion of plaintiff's activities, the ALJ found that

plaintiff's attorney's additional limitations were "unfounded." (*Id.*)  Thus, the ALJ found that plaintiff was not disabled.

## V.    ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.    The ALJ's RFC determination is not supported by substantial evidence. (Pl.'s Br. at 8-14). (Dkt. No. 11).

2.    The ALJ's credibility determination is not supported by substantial evidence. (Pl.'s Br. at 14-18).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 7-15) (Dkt. No. 12).  For the following reasons, this court agrees with the defendant and will order dismissal of the complaint.

## VI.    RFC EVALUATION/CREDIBILITY

### A.    Legal Standards

#### 1.    RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical

facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### 2.    Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 416.929; *see also Foster*

*v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to function. 20 C.F.R. § 416.929(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 416.929(c)(3).

**B.     Application**

Plaintiff argues that the ALJ erred in determining that plaintiff could engage in light work with restrictions and erred in failing to properly assess the frequency that she would have to use the bathroom during the day. Plaintiff also argues that the ALJ erred in considering the RFC evaluation, written by a "Single Decision Maker ("SDM"), who

is not a medical source and whose opinion should not be given any weight in the RFC determination. Plaintiff argues that the ALJ must have "implicitly" and "improperly" relied on the SDM because none of her medical sources specifically discussed functional restrictions for plaintiff. Because the only "complete" RFC in the record was written by the SDM, who found that plaintiff could perform light work, and the ALJ found that plaintiff could perform light work, he must have relied upon the SDM.

The Second Circuit has rejected "the argument that the ALJ committed reversible error by merely referencing the findings of a state agency reviewer." *Koch v. Colvin*, 570 F. App'x 99, 102 (2d Cir. 2014). The court in *Koch* stated that while it was "'indeed error to treat a disability analyst as a doctor,' . . . the ALJ's error was harmless because his RFC finding is supported by substantial evidence." *Id.* (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013)). In this case, the ALJ stated that

> A Disability Determination Services (DDS) single decision maker evaluated the claimant for a functional assessment. While a single decision maker is an *unacceptable medical source*, I have nonetheless accounted for this evaluation in assessing the severity of the claimant's alleged conditions.

(T. 20) (emphasis added). The court acknowledges that the ALJ's terminology may have been incorrect. The proper statement is that an SDM is not an acceptable medical source, rather than an "unacceptable" medical source. *Lozama v. Colvin*, No. 1:13-CV-20, 2016 WL 1259411, at *5 (N.D.N.Y. Mar. 30, 2016) (citing 20 C.F.R. §§ 404.1513(c) & (d), 416.913(c) & (d)). SDMs are "'non-physician disability examiners who may make the initial disability determination in most cases without requiring the

signature of a medical consultant.'" *Id.* (quoting *Hart v. Astrue*, 32 F. Supp. 3d 227, 237 (N.D.N.Y. Sept. 17, 2012) (citing 71 FR 45890-01, 2006 WL 2283653 (Aug. 10, 2006)). ALJs have been instructed not to afford RFC determinations by SDMs "any evidentiary weight at the administrative hearing level." *Id.* (citing *Hart*, 32 F. Supp. 3d at 237).

In this case, plaintiff finds fault with the ALJ's terminology because plaintiff correctly states that the SDM is not a medical source at all, rather than an "unacceptable" one. A more precise quotation of the regulations would have been more accurate, but even assuming that the ALJ's statement was erroneous, it is harmless. The ALJ did ***not*** state that he gave the SDM source any "weight," recognizing that the source was not acceptable. Instead, the ALJ only stated that he "accounted" for the SDM's opinion in assessing the severity of the plaintiff's conditions.[8] (T. 20).

In addition, it is clear that the ALJ did not simply accept the RFC determination make by the SDM. The SDM found only that plaintiff could perform a full range of "light" work. (T. 66). The ALJ's RFC determination included several more significant limitations that were suggested by the record and plaintiff's testimony. The ALJ's RFC

---

[8] The court notes that the regulations specifically provide that the ALJ may consider "other sources to show the severity of your impairment(s) and how it affects your ability to work." 20 C.F.R. §§ 404.1513(d), 416.913(d). These sources include "but are not limited to" medical sources who are not listed as "acceptable;" educational personnel; public and private social welfare agency personnel; and "other" non-medical sources   spouses, parents, other caregivers, siblings, other relatives, friends, neighbors, and clergy." *Id.* §§ 404.1513(d)(1)-(d)(4), 416.913(d)(1)-(d)(4). An SDM would fit into the "non-medical" source category, at least to the same extent that a parent, sibling or other relative would fit into that category. Thus, although the non-medical source may not be used to establish an impairment or to contradict a physician's opinion, the regulations do contemplate such consideration, and the ALJ's reference to the SDM, particularly when he accepted that the SDM was not an acceptable medical source and did not rely solely on the SDM's opinion to determine plaintiff's RFC is not error. Even if it was error, it was harmless.

14

determination was supported by other substantial evidence in the record. As one of several examples, the SDM stated that plaintiff could sit, stand, and walk for six hours (with normal breaks) during an eight-hour day, with no additional limitations. (T. 66). However, the ALJ found that, even though plaintiff could sit, stand, and walk for six hours, she was limited to sitting, standing, and walking each independently for only ***one hour at a time*** before having to transition to one of the two remaining alternatives. (T. 17). The ALJ also noted that the six hours would include "interruptions" as well as regularly scheduled breaks. (*Id.*)

The SDM found that plaintiff had "no" environmental limitations, while the ALJ found that plaintiff would need to avoid concentrated exposure to wetness and workplace hazards, including unprotected heights and dangerous machinery. (*Id.*) More importantly, the ALJ found that plaintiff would need "unimpeded access" to the restroom during regularly scheduled breaks. (*Id.*) The additional limitations were the basis for calling a VE to testify at plaintiff's hearing. Thus, it is clear that the ALJ did not "implicitly" rely[9] upon the SDM's RFC evaluation in determining plaintiff's RFC.

Plaintiff also argues that the ALJ erred in determining that plaintiff could occasionally lift up to 20 pounds, and that, just because plaintiff's treating physicians did not put a limit on plaintiff's ability to lift, she is not necessarily able to do so. (Pl.'s Br. at 10-11). While it is true that plaintiff underwent several surgeries, her treating physician, Dr. Canete has told her to resume her "regular level of activity as tolerated" after the surgeries. (T. 366, 382). On March 25, 2014, NP Grove reported that in

---

[9] Plaintiff even refers to the ALJ's action as "implicit *partial* reliance." (Pl.'s Br. at 10) (emphasis added).

plaintiff's "conversations with Dr. Canete, he has indicated to her that she can not lift over 50 lbs and should watch the reaching, pulling and pushing." (T. 408). While plaintiff argues that such a limitation is not written in any of Dr. Canete's reports, the plaintiff did report this statement by Dr. Canete to NP Grove. In any event, the ALJ did not find that plaintiff could lift 50 pounds. Light work requires only that a claimant be able to lift no more than 20 pounds at a time and up to 10 pounds "frequently." 20 C.F.R. §§ 404.1567(b), 416.967(b). This was only one statement that the ALJ took into consideration. Dr. Canete's reports did state that plaintiff could resume her "regular level of activity," which plaintiff testified was quite high before her medical problems began. She stated that she was extremely active and could pick up a 50 pound bag of dog food. (T. 42).

During the March 2014 examination, plaintiff also told NP Grove that she was going to the gym three times per week and using the "gazelle" at home. (T. 408). She had increased her walking time from 25 to 45 minutes, and her speed had increased from 2.4 to 3.2 mph. (*Id.*) Although plaintiff was frustrated because she had not lost any weight, she was "feeling great," and "all in all she [was] doing well." (*Id.*) NP Grove's report also indicated that plaintiff had four children and was "working" as a foster parent.[10] (*Id.*)

Plaintiff argues that the ALJ failed to place sufficient weight on the consultative physician Tanya Perkins-Muantuali, M.D., who, on May 17, 2013, found that plaintiff had a moderate to marked limitation on bending, twisting, lifting, pushing, pulling,

---

[10] The ALJ also noted that NP Grove is a "non-acceptable medical source," but that he "considered her medical opinion in assessing the severity of the claimant's condition. (T. 19).

reaching, carrying, and squatting "secondary" to her hernia. (T. 335). Dr. Perkins-Muantuali stated that plaintiff was having eight to ten bowel movements per day with cramping and intermittent pain, and that her prognosis was "guarded." (*Id.*) The ALJ gave the consultative physician only "some" weight because the examination was conducted prior to plaintiff's hernia operation and prior to NP Grove's March 2014 evaluation. (T. 19-20).

Plaintiff argues that she continued to have pain after the surgery, and thus, the ALJ's statement that her condition improved after surgery was not supported by substantial evidence. It is true that in NP Grove's March 25, 2014 report, she noted that plaintiff had been examined by Dr. Canete for a follow up of the hernia surgery because she was having right quadrant pain. (T. 408). A CT scan was ordered, and Dr. Canete believed that plaintiff's intestines had adhered to the mesh used to repair the hernia. He discussed plaintiff's options with her, but they concluded that the options were risky, and the result could be that she would be required to use "a bag for the rest of her life." (*Id.*) Plaintiff understandably did not wish to take that risk.

However, the March 25, 2014 report is the same document in which NP Grove stated that plaintiff was going to the gym, improving her walking ability, and "feeling great." Her physical examination was good. (T. 408-409). NP Grove noted that plaintiff was really motivated to get her weight down, was exercising and watching her diet, even though she was not successful at losing the weight. (T. 409). At the end of the document, NP Grove states that she discussed the "disability papers" that she received. NP Grove stated that "I rev[iewed] with her the Mental Capacity not

17

incapacitated," and stated that she would "complete the functional capacity portion and send back." (T. 409). There is no further functional assessment by NP Grove in the record. Thus, plaintiff's argument that the ALJ should have given the consultative examiner greater weight because plaintiff did not improve after the hernia surgery is not supported by the record.

The ALJ also listed plaintiff's extensive daily activities in support of his RFC determination. (T. 21). Plaintiff cared for numerous dogs, cared for her children and foster children, helped her children get ready for school, went to the gym multiple times per week, did household chores, prepared meals, had no issues with personal care, drove a car, went to visit her mother in a nursing home at least once per day, helped her father-in-law with appointments and other things, went shopping, and went on camping trips with her children. (T. 21). These are extensive activities that are not consistent with severe limitations.

Finally, plaintiff raises the issue of the frequency with which she must use the bathroom. The plaintiff claims that she must go to the bathroom 8-10 times per day. This is not a medical opinion. Her treating sources essentially repeat plaintiff's statements in this regard. However, she has also reported to her treating sources that her "frequency" does not include incontinence. She told Dr. Canete several times that she had no difficulty delaying defecation so that she could get to a bathroom. (T. 364, 366).

At one point during the hearing, plaintiff testified that she had to use the bathroom ten to fifteen times per day for "maybe" five minutes at a time. (T. 48).

Earlier plaintiff stated that she "still" goes either eight to ten times or more than that a day." (T. 39). Plaintiff testified that she stopped going to the gym because she would have to stop her treadmill workout to go to the bathroom. (T. 38-39). The VE testified that if a person needed to use the bathroom 10-15 times per day, then she could not perform any of the jobs that the VE proposed. (T. 55). However, the VE also testified that a person could "go to the restroom, maybe even hourly, but just a few minutes. If the person needed to be out up to *ten* minutes at a time, then it really gets to the point where . . . productivity is going to start to get affected." (T. 56) (emphasis added). However, plaintiff's testimony was that she was only in the bathroom for five minutes, not ten minutes as the attorney asked in his hypothetical question. (T. 48).

The ALJ found that plaintiff was not entirely credible with respect to the extent of this limitation. In making his credibility determination, the ALJ noted that the most recent treatment notes indicated that plaintiff was improving and making strides in her exercise routine. (T. 21). In addition, the most recent medical evidence did "not indicate that she needed to use the restroom as much as she reported during the hearing." (*Id.*) The ALJ then recited all of plaintiff's activities, stating that they were "greater than she generally reported." (*Id.*) The ALJ also noted that plaintiff's treating physician did not prescribe any pads or liners, and that some of her frequency may have been related to weight gain, which would be "treatable with weight loss."[11] (*Id.*)

---

[11] It is undisputed that the ALJ misidentified the treating physician to which he was referring in this section of his decision. He referred to the doctor as Dr. Alessi, but he is referring to the reports written by Dr. Canete. Plaintiff also argues that the ALJ mischaracterized this statement by Dr. Canete because the ALJ implied that her frequency could be "cured" by weight loss. (Pl.'s Br. at 16). However, that is not what the ALJ said. He was simply repeating what Dr. Canete said after a discussion with plaintiff's husband who noted that plaintiff had gained weight. (T. 388). Dr. Canete

On April 12, 2013, plaintiff reported to Dr. Canete that she moved her bowels eight times per day, but "she reports the frequency is manageable." (T. 364). She reported "no difficulty" in delaying defecation when the urge appears in order to find a bathroom," and she was tolerating a regular diet without difficulty. (T. 364). On November 25, 2013, plaintiff reported to NP Grove that plaintiff was the go-to person for her children, her husband, her father-in-law, and her mother, who was in a nursing home. (T. 416). NP Grove stated that plaintiff needed "to step back and delegate work to other family members." (*Id.*) She took her father-in-law to appointments, put out his medications, and paid his bills, even though he was 77 and "capable." Plaintiff had young children and foster children with "behavior/special needs" that she is responsible for. In addition, although she was one of nine children, plaintiff was the only one who was involved with her mother. (T. 416). Plaintiff also reported that although she had abdominal discomfort, Aleve helped. (*Id.*) Clearly, plaintiff is extremely active, and the ALJ statement that plaintiff was more active than she admitted at the hearing is supported by substantial evidence.[12]

---

stated that he agreed that the plaintiff's weight gain "may have increased the tension exerted on the implanted mesh, resulting in additional discomfort . . . . I agree with the patient and her husband that a program of weight loss is in her best interest for overall health as well as her current symptoms." (*Id.*) The ALJ stated that plaintiff's "condition" was related to weight gain, and was "treatable," by weight loss. (T. 21). Treatable does not mean "cured," and Dr. Canete specifically stated that he agreed that weight loss would be in the plaintiff's best interests. Thus, the ALJ did not "mischaraterize" Dr. Canete's statement.

[12] Although the court notes that NP Grove is not an "acceptable medical source" to establish an impairment, the court is merely repeating the plaintiff's statements with regard to her activities. The November 25, 2013 report was for a follow-up to her mental status, NP Grove treated plaintiff for both mental and physical issues, and plaintiff's statements during this examination reveal the extent of her activities, both physical and mental.

On February 24, 2014, NP Grove reported that plaintiff noticed a pain in her right abdomen, and thought it might be a hernia; but she had been doing "some heavy lifting," and the more activity she does, the worse the pain, but her "bowels were fine." (T. 411). She had adopted two foster children and was having some issues regarding this, so "she has a lot on her mind." (*Id.*) Although it is unclear what "heavy" lifting entails for the plaintiff, NP Grove's report indicates that plaintiff was quite active, to the point that the extent of her activities was causing her stress. NP Grove stated that she would order a CT scan and only recommended "no heavy lifting." (T. 412).

Based on these statements about plaintiff's activities in the record, the ALJ's determination that plaintiff was not completely credible with respect to her limitations was supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for the **DEFENDANT.**

Dated: November 14, 2016

Hon. Andrew T. Baxter
U.S. Magistrate Judge